**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VALLE DEL SOL INCORPORATED;
C.M., a minor; JOSE ANGEL
VARGAS; COALICION DE DERECHOS
HUMANOS; UNITED FOOD AND
COMMERCIAL WORKERS
INTERNATIONAL UNION; BORDER
ACTION NETWORK; JIM SHEE; LUZ
SANTIAGO; ARIZONA SOUTH ASIANS
FOR SAFE FAMILIES; JAPANESE
AMERICAN CITIZENS LEAGUE;
LOCAL 5 SERVICE EMPLOYEES
INTERNATIONAL UNION; SOUTHSIDE
PRESBYTERIAN CHURCH; MUSLIM
AMERICAN SOCIETY; TONATIERRA
COMMUNITY DEVELOPMENT
INSTITUTE; ASIAN CHAMBER OF
COMMERCE OF ARIZONA; SERVICE
EMPLOYEES INTERNATIONAL UNION;
ARIZONA HISPANIC CHAMBER OF
COMMERCE; PEDRO ESPINOZA;
MAURA CASTILLO; MARIA
MORALES,

                *Plaintiffs-Appellees*,

        v.

MICHAEL B. WHITING; EDWARD G.
RHEINHEIMER; DAVID W. ROZEMA;
DAISY FLORES; KENNY ANGLE;

No. 12-15688

D.C. No.
2:10-cv-01061-
SRB

OPINION

DEREK D. RAPIER; SAM VEDERMAN; RICHARD M. ROMLEY; MATTHEW J. SMITH; BRADLEY CARLYON; BARBARA LAWALL; JAMES P. WALSH; GEORGE SILVA; SHILA S. POLK; JON R. SMITH, County Attorneys in their official capacities; JOSEPH DEDMAN, JR.; LARRY A. DEVER; BILL PRIBIL; JOHN R. ARMER; PRESTON J. ALLRED; STEVEN N. TUCKER; DONALD LOWERY; JOSEPH M. ARPAIO; TOM SHEAHAN; KELLY CLARK; CLARENCE W. DUPNIK; PAUL R. BABEU; TONY ESTRADA; STEVE WAUGH; RALPH OGDEN, County Sheriffs, in their official capacities,
*Defendants*,

and

STATE OF ARIZONA; JANICE K. BREWER,
   *Intervenor-Defendants-Appellants*.

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted
October 17, 2012—San Francisco, California

Filed March 4, 2013

Before: Raymond C. Fisher, Richard C. Tallman and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Fisher

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's grant of a preliminary injunction barring the enforcement of two provisions in Arizona's Senate Bill 1070, which make it unlawful for a motor vehicle occupant to hire or attempt to hire a person for work at another location from a stopped car that impedes traffic, or for a person to be hired in such a manner.

The panel held that the district court correctly determined that, though Arizona has a significant government interest in promoting traffic safety, the day labor provisions failed the requirement set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980), that restrictions on commercial speech be no more extensive than necessary to serve that interest. The panel held that the district court did not abuse its discretion in concluding that the plaintiffs were likely to succeed on the

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

merits and that the other requirements for a preliminary injunction were satisfied.

**COUNSEL**

John J. Bouma, Robert A. Henry (argued) and Kelly A. Kszywienski, Snell & Wilmer L.L.P., Phoenix, Arizona; Joseph Sciarrotta, Jr., Office of Governor Janice K. Brewer, Phoenix, Arizona, for Appellants.

Thomas C. Horne, Attorney General, Michael Tryon, Senior Litigation Counsel, and Evan Hiller, Assistant Attorney General, Phoenix, Arizona, for Appellant State of Arizona.

Thomas A. Saenz, Victor Viramontes (argued) and Nicholás Espíritu, Mexican American Legal Defense and Educational Fund, Los Angeles, California; Omar C. Jadwat and Andre Segura, American Civil Liberties Union Foundation Immigrants' Rights Project, New York, New York; Linton Joaquin, Karen C. Tumlin, Nora A. Preciado, Melissa S. Keaney and Álvaro M. Huerta, National Immigration Law Center, Los Angeles, California; Nina Perales, Mexican American Legal Defense and Educational Fund, San Antonio, Texas; Chris Newman and Lisa Kung, National Day Labor Organizing Network, Los Angeles, California; Marita Etcubañez and Jessica Chia, Asian American Justice Center, Washington, D.C.; Cecillia D. Wang, American Civil Liberties Union Foundation Immigrants' Rights Project, San Francisco, California; Daniel J. Pochoda and James Duff Lyall, ACLU Foundation of Arizona, Phoenix, Arizona; Daniel R. Ortega, Ortega Law Firm, P.C., Phoenix, Arizona;

Yungsuhn Park, Connie Choi and Carmina Ocampo, Asian Pacific American Legal Center, a member of Asian American Center for Advancing Justice, Los Angeles, California, for Appellees.

Aaron Leiderman, Munger, Tolles & Olson LLP, San Francisco, California; Bradley S. Phillips, Joseph J. Ybarra, Benjamin J. Maro, Lika C. Miyake and Margaret G. Ziegler, Munger, Tolles & Olson LLP, Los Angeles, California, for all Appellees except Maria Morales and Service Employees International Union, Service Employees International Union, Local 5, United Food and Commercial Workers International Union and Japanese American Citizens League.

Stephen P. Berzon and Jonathan Weissglass, Altshuler Berzon LLP, San Francisco, California, for Appellees Service Employees International Union, Service Employees International Union, Local 5 and United Food and Commercial Workers International Union.

## OPINION

FISHER, Circuit Judge:

Two provisions in Arizona's Senate Bill 1070 make it unlawful for a motor vehicle occupant to hire or attempt to hire a person for work at another location from a stopped car that impedes traffic, or for a person to be hired in such a manner. These provisions raise First Amendment concerns because they restrict and penalize the commercial speech of day laborers and those who would hire them. Arizona defends the provisions as traffic safety measures, designed to promote the safe and orderly flow of traffic. We

acknowledge that Arizona has a real and substantial interest in traffic safety. Arizona, however, has failed to justify a need to serve that interest through targeting and penalizing day labor solicitation that blocks traffic, rather than directly targeting those who create traffic hazards without reference to their speech, as currently proscribed under the State's pre-existing traffic laws. Laws like this one that restrict more protected speech than is necessary violate the First Amendment.[1]

Arizona has also singled out day labor solicitation for a harsh penalty while leaving other types of solicitation speech that blocks traffic unburdened. Arizona defends this content-based distinction by invoking the "unique" dangers posed by labor solicitation. That justification is only minimally supported by the record and, tellingly, S.B. 1070's introduction says nothing about traffic safety. Rather it emphasizes that its purpose is to encourage self-deportation by stripping undocumented immigrants of their livelihood. Adopting content-based restrictions for reasons apparently unrelated to traffic safety further supports the conclusion that the day labor provisions restrict more speech than necessary.

Accordingly, the district court did not abuse its discretion in concluding that the plaintiffs were likely to succeed on the merits of their First Amendment challenge to the day labor provisions. We therefore affirm the district court's grant of a preliminary injunction barring their enforcement.

---

[1] S.B. 1070 contains other provisions that, although they were challenged in the same underlying district court action, are not at issue in this appeal.

## BACKGROUND

The two provisions challenged here were included as part of Section 5 of Arizona's recent comprehensive immigration reform bill, S.B. 1070. *See* Ariz. Rev. Stat. §§ 13-2928(A)–(B) (Sections 5(A) and (B), collectively the day labor provisions). Section 5(A) makes it a crime for an occupant of a motor vehicle to solicit or hire a day laborer if the motor vehicle blocks or impedes traffic. Section 5(B) makes it a crime for a day laborer to enter a motor vehicle to work at a different location if the motor vehicle blocks or impedes traffic.[2] Following several years of deliberation, the Arizona House of Representatives passed the day labor provisions in February 2010 as a standalone bill. State Representative John Kavanagh, the provisions' principal legislative sponsor, said at committee hearings that the provisions would promote traffic safety but would also discourage the "shadow economy" of day labor and address illegal immigration because "[a] large number of these people

---

[2] Specifically, the day labor provisions state:

> A. It is unlawful for an occupant of a motor vehicle that is stopped on a street, roadway or highway to attempt to hire or hire and pick up passengers for work at a different location if the motor vehicle blocks or impedes the normal movement of traffic.

> B. It is unlawful for a person to enter a motor vehicle that is stopped on a street, roadway or highway in order to be hired by an occupant of the motor vehicle and to be transported to work at a different location if the motor vehicle blocks or impedes the normal movement of traffic.

Ariz. Rev. Stat. § 13-2928(A)-(B).

are illegal immigrants and this is the way they get work, and this work is one of the anchors that keeps them in the country." After the day labor provisions passed the Arizona House of Representatives, the Arizona Senate adopted them as an amendment to S.B. 1070, an omnibus immigration bill.

S.B. 1070 includes a purposes clause, common to all sections of the bill, which states that the "intent of [S.B. 1070] is to make attrition through enforcement the public policy of all state and local government agencies in Arizona" and that the "provisions of this act are intended to work together to discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States." *See* S.B. 1070, ch. 113, 2010 Ariz. Sess. Laws § 1.

In May 2010, the plaintiffs filed suit in the District of Arizona seeking a declaration that S.B. 1070 is unconstitutional in its entirety. The plaintiffs are various organizations and individuals affected by S.B. 1070. The defendants are various county officials as well as the state of Arizona and Arizona Governor Janice Brewer, who intervened as defendants. In June 2010, the plaintiffs moved for a preliminary injunction, arguing that the day labor provisions violate the First Amendment. They renewed their motion in October 2011, after we held in *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach (Redondo Beach)*, 657 F.3d 936 (9th Cir. 2011) (en banc), that a Redondo Beach ordinance restricting all roadside solicitation violates the First Amendment. *See id.* at 950–51 (holding that the restriction inhibited more speech than necessary to serve the city's goal of promoting traffic safety).

The district court issued a preliminary injunction barring enforcement of the day labor provisions in February 2012. The key issue before the district court was whether the plaintiffs are likely to succeed on the merits of their First Amendment claim. The district court first held that *Redondo Beach* does not control this case because the day labor provisions, unlike the Redondo Beach ordinance, are explicitly limited to commercial speech. The court then evaluated the day labor provisions under the four-pronged test for restrictions on commercial speech the Supreme Court first set out in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980). Under that test, we first evaluate whether the affected speech is misleading or related to unlawful activity. *See World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 684 (9th Cir. 2010) (quoting *Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 903 (9th Cir. 2009)). If not, the government bears the burden of showing that it has a substantial interest, that the restriction directly advances that interest and that the restriction is not more extensive than necessary to serve the interest. *See id.* The district court held that *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011), required it to apply a more demanding version of the "not more extensive than necessary" test to content-based restrictions on commercial speech. Finding the day labor provisions to be content-based, the district court applied *Sorrell* and analyzed whether they were "drawn to achieve" a substantial government interest.

Applying *Central Hudson*'s threshold requirement that speech be related to lawful activity and not misleading, the court ruled that because day labor is lawful activity, restrictions on the solicitation of day labor merit First Amendment scrutiny. Applying the "substantial interest" prong, the court credited Arizona's uncontroverted assertion

that Arizona has a substantial government interest in traffic safety. Applying the "direct advancement" prong, the court concluded that the day labor provisions directly advance that interest because they prohibit traffic-blocking activity that would otherwise take place. Under the "not more extensive than necessary" prong, however, the district court first held that the day labor provisions are content-based restrictions and then held that the "[d]efendants have not shown that [they] . . . are drawn to achieve the substantial governmental interest in traffic safety." On the contrary, the district court noted, the ordinance "appears to be structured to target particular speech rather than a broader traffic problem." The court cited the purposes clause of S.B. 1070 and the existence of obvious and less-burdensome alternatives as further evidence that the day labor provisions were not drawn to advance Arizona's interest in traffic safety.

The district court concluded that the plaintiffs are likely to succeed on the merits because the day labor provisions are insufficiently tailored under *Central Hudson*'s fourth prong as modified by *Sorrell*. It then found that the other requirements for a preliminary injunction (irreparable harm, balance of the equities and the public interest) were met and granted a preliminary injunction barring enforcement of the provisions. The intervenor defendants filed this interlocutory appeal.

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res.*

*Def. Council, Inc.*, 555 U.S. 7, 20 (2008). We review an order granting a preliminary injunction for an abuse of discretion. *See Katie A. ex rel. Ludin v. Los Angeles County*, 481 F.3d 1150, 1155 (9th Cir. 2007). "Under this standard, [a]s long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011) (alteration in original) (quoting *Dominguez v. Schwarzenegger*, 596 F.3d 1087, 1092 (9th Cir. 2010), *vacated on other grounds by Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204 (2012)). "This review is limited and deferential, and it does not extend to the underlying merits of the case." *Id.* (quoting *Johnson v. Couturier*, 572 F.3d 1067, 1078 (9th Cir. 2009)) (internal quotation marks omitted). When the district court bases its decision on an erroneous legal standard, we review the underlying issues of law de novo. *See Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 994 (9th Cir. 2011) (per curiam). "[W]hen a district court grants a preliminary injunction protecting First Amendment rights, '[i]f the underlying constitutional question is close . . . we should uphold the injunction and remand for trial on the merits.'" *Thalheimer*, 645 F.3d at 1128 (second alteration in original) (quoting *Ashcroft v. ACLU*, 542 U.S. 656, 664–65 (2004)).

## DISCUSSION

Day laborers are those who, rather than having a fixed place of employment, perform temporary work such as gardening, tree trimming, yard clean-up, moving, construction work, house cleaning and elder care. Because such day laborers do not have a fixed place of employment, they advertise their availability for employment by gathering

in a visible location and then gesturing to motorists or otherwise communicating their availability to work. Day laborers frequently congregate on street corners and sidewalks, and those who would hire day laborers often stop in the road to negotiate terms and complete the hire. The day labor provisions restrict speech by penalizing the solicitation of day labor work when that solicitation impedes traffic. The plaintiffs introduced declarations showing that, after the provisions' passage but before the district court enjoined enforcement, employers refrained from hiring day laborers on public streets and day laborers refrained from soliciting work from the roadside out of fear of prosecution.

Arizona concedes that the day labor provisions restrict day laborers' and would-be employers' speech. But it argues the provisions are permissible because it is illegal to block traffic and because day labor solicitation presents unique traffic safety concerns that justify special treatment of such speech when it blocks traffic. Plaintiffs counter that Arizona's asserted interest in traffic safety is a sham; that the true purpose of the provisions is to remove day laborers from public view and to suppress their economic opportunities.

Regulations that inhibit speech must comport with the requirements of the First Amendment. We recognize that Arizona has a significant interest in protecting the safe and orderly flow of traffic on its streets. We similarly credit Arizona's assertion that the roadside solicitation of labor may create dangerous traffic conditions. The First Amendment requires more than the invocation of a significant government interest, however. Rather, it requires that the restriction's benefits be balanced against the burden on protected speech. How we conduct this balancing depends on what type of speech is regulated and whether the regulation is content-

based or content-neutral. We shall address these questions before turning to the ultimate question of whether Arizona's interest in traffic safety justifies its restriction on day labor solicitation.

## I.

The district court correctly determined that the day labor provisions are content-based restrictions on commercial speech.

### A.  The Day Labor Provisions Restrict Only Commercial Speech

Commercial speech is that "which does 'no more than propose a commercial transaction.'" *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385 (1973)). Such speech is protected by the First Amendment, but to a lesser degree than other types of speech. *See United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001) ("We have used standards for determining the validity of speech regulations which accord less protection to commercial speech than to other expression."). A motorist who pulls over and either hires or attempts to hire a day laborer has proposed a commercial transaction.[3] By the same token, a day laborer

---

[3] At oral argument, Arizona argued that the day labor provisions apply only to consummated transactions and not to negotiations or attempts to hire a day laborer. That argument is belied by the plain language of Section 5(A), which explicitly penalizes the "attempt to hire . . . and pick up passengers for work at a different location." We will not apply a limiting construction that is contrary to the plain language of the statute. *See Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569,

soliciting work from the roadside proposes a commercial transaction. Because the day labor provisions are explicitly limited to attempts to hire, hiring, picking up and transporting workers to work at a different location, all affected speech is either speech soliciting a commercial transaction or speech necessary to the consummation of a commercial transaction.

The plaintiffs, however, argue that day labor solicitation speech is "core" First Amendment speech because it is inextricably intertwined with core political and economic messages. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) (holding that commercial speech does not "retain[] its commercial character when it is inextricably intertwined with otherwise fully protected speech"). Plaintiffs may be correct that day laborers convey vital political and economic messages when they solicit work from the side of the road, but those messages are not inextricably intertwined with the speech the day labor provisions regulate. Nothing in those provisions prohibits a worker from expressing his views publicly, nor is there any reason such views cannot be expressed without soliciting work. *See Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 474 (1989) ("No law of man or of nature makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares.").

Immigration policy and economic equality are matters of public importance and the mere presence of day laborers on the street may express something about their own views on these topics. The presence of day laborers soliciting work in

575 (1987) (refusing to adopt a limiting construction because "the words of the resolution simply leave no room for a narrowing construction").

the streets may also increase the salience of economic or immigration debates to others who encounter the day laborers. However compelling these arguments, the Supreme Court has made clear that "advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 68 (1983) (quoting *Cent. Hudson*, 447 U.S. at 563 n.5)). The act of soliciting work as a day laborer may communicate a political message, but the primary purpose of the communication is to advertise a laborer's availability for work and to negotiate the terms of such work. The district court correctly concluded that the day laborer provisions restrict only commercial speech.

## B.  The Day Labor Provisions Are Content-Based Restrictions

The district court also correctly determined that the day labor provisions are content-based restrictions on commercial speech. "A regulation is content-based if either the underlying purpose of the regulation is to suppress particular ideas or if the regulation, by its very terms, singles out particular content for differential treatment." *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (en banc) (citation omitted). On their face, the day labor provisions target one type of speech – day labor solicitation that impedes traffic – but say nothing about other types of roadside solicitation and nonsolicitation speech. They are therefore classic examples of content-based restrictions. Our conclusion is confirmed by the stated purpose of the provisions, their legislative history and the disproportionate sanctions they impose for traffic problems arising from day labor solicitation. *See Sorrell v. IMS Health Inc.*, 131 S. Ct.

2653, 2663 (2011) ("Just as the 'inevitable effect of a statute on its face may render it unconstitutional,' a statute's stated purposes may also be considered" in determining whether it is content-based. (quoting *United States v. O'Brien*, 391 U.S. 367, 384 (1968))); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000) (noting that a speech by a bill's sponsor supported the Court's determination that the bill was content-based); *cf. Moss v. U.S. Secret Serv.*, 675 F.3d 1213, 1224–25 (9th Cir. 2012) (holding that differential treatment supports an inference of viewpoint discrimination).

The district court reasonably determined that the purpose of the day labor provisions was to suppress labor-solicitation speech rather than to promote traffic safety. Significantly, the purposes clause introducing S.B. 1070 describes it as an immigration bill, not a traffic safety bill. *See* S.B. 1070, ch. 113, 2010 Ariz. Sess. Laws § 1 (The "intent of [S.B. 1070] is to make attrition through enforcement the public policy of all state and local government agencies in Arizona" and the "provisions of this act are intended to work together to discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States."). This clear and unambiguous expression of purpose contradicts Arizona's argument that the day labor provisions are content-neutral traffic regulations. Rather, they appear expressly intended to deter day labor activity by undocumented immigrants.

Though not dispositive of legislative intent, portions of the legislative history also evince hostility to day laborer solicitation rather than concern with traffic safety. For instance, State Representative Kavanagh, the day labor provisions' principal legislative sponsor, stated at committee hearings that they would promote traffic safety but that they

would also discourage the "shadow economy" of day labor and address illegal immigration because "[a] large number of these people are illegal immigrants and this is the way they get work, and this work is one of the anchors that keeps them in the country."

Finally, the day labor provisions' punishment is far out of line with punishments for other similar traffic violations. For example, conduct that *recklessly* impedes traffic is punishable by 30 days' imprisonment, but day labor solicitation that is not dangerous or reckless, but merely impedes traffic, is a class 1 misdemeanor punishable by up to six months' imprisonment. *Compare* Ariz. Rev. Stat. § 13-2928(F) (violation of the day labor provisions is a class 1 misdemeanor), *and* § 13-707(A)(1) (class 1 misdemeanor punishable by up to six months' imprisonment), *with* § 13-2906 (recklessly interfering with the passage of any highway or public thoroughfare is a class 3 misdemeanor), *and* § 13-707(A)(3) (class 3 misdemeanor punishable by up to 30 days' imprisonment). The imposition of a much harsher penalty for those who block traffic while engaging in labor solicitation speech evidences the desire to suppress such speech.

Arizona argues that the day labor provisions are content-neutral because they were enacted to ameliorate "secondary effects" – the traffic problems created when day laborers congregate and solicit employment from passing vehicles. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986) (holding that a zoning regulation on adult theaters was content-neutral because it had been enacted to "prevent crime, protect the city's retail trade, maintain property values, and generally [protect] and [preserve] the quality of [the City's] neighborhoods, commercial districts, and the quality of urban life" (internal quotation marks omitted)). Arizona

raised this argument before the district court, which implicitly rejected it by finding that the day labor provisions are content-based. This rejection was not an abuse of discretion in light of the facts showing that the purpose of the day labor provisions was to suppress labor-solicitation speech. *Cf. id.* (holding that a content-neutral "'predominate' intent[] . . . is more than adequate to establish that the city's [purpose] . . . was unrelated to the suppression of free expression."). Arizona's argument that the day labor provisions are content-neutral under *Hill v. Colorado*, 530 U.S. 703, 719–20 (2000), because they are "justified" by its interest in traffic safety suffers from the same defect. *See ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 793 (9th Cir. 2006) ("'[T]he mere assertion of a content-neutral purpose [is not] enough to save a law which, on its face, discriminates based on content.' . . . [Instead,] we will hold that [an] ordinance is content-based if . . . *the main purpose in enacting it* was to suppress or exalt speech of a certain content." (first and second alterations in original) (emphasis added) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642–43 (1994))).

The district court correctly concluded that the day labor provisions are content-based restrictions.

## II.

The district court also correctly concluded that the day labor provisions are likely *unconstitutional* restrictions. We evaluate restrictions on commercial speech using the four-part test from *Central Hudson*:

> (1) if the communication is neither misleading nor related to unlawful activity, then it merits First Amendment scrutiny as a threshold

matter; in order for the restriction to withstand such scrutiny, (2) [t]he State must assert a substantial interest to be achieved by restrictions on commercial speech; (3) the restriction must directly advance the state interest involved; and (4) it must not be more extensive than is necessary to serve that interest.

*World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 684 (9th Cir. 2010) (alteration in original) (internal quotation marks omitted) (quoting *Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 903 (9th Cir. 2009)). The parties dispute whether the day labor provisions satisfy *Central Hudson*'s first, third and fourth prongs. The parties also raise the challenging issue of whether *Sorrell*, 131 S. Ct. at 2664, 2667–68, made the fourth *Central Hudson* prong for content-based restrictions on commercial speech even more demanding for the state. We conclude that the day labor provisions are deficient under even the pre-*Sorrell*, arguably more government-friendly, precedent urged by Arizona. We will therefore apply that precedent and defer extended discussion of *Sorrell* for a more appropriate case with a more fully developed factual record. We turn to each of *Central Hudson*'s four prongs in turn.

## A. Day Laborer Solicitation Is Neither Misleading nor Related to Unlawful Activity

Commercial speech merits First Amendment protection only if "the communication is neither misleading nor related to unlawful activity." *World Wide Rush*, 606 F.3d at 684 (quoting *Metro Lights*, 551 F.3d at 903). Arizona argues that the day labor provisions are permissible because they regulate

speech only when associated with the unlawful activity of blocking or impeding traffic. Arizona's proposed rule would be a novel extension of *Central Hudson*'s legality requirement, which has traditionally focused on the content of affected speech – i.e., whether the speech proposes an illegal transaction – instead of whether the speech is associated with unlawful activity. *See Wash. Mercantile Ass'n v. Williams*, 733 F.2d 687, 691 (9th Cir. 1984) (rejecting the argument that drug paraphernalia's association with illegal drug use allows the state to restrict all paraphernalia advertising; instead holding that paraphernalia advertising is not protected in states where such sales are illegal but that paraphernalia advertising warrants First Amendment scrutiny if the advertising proposes a sale in a state where such sales are legal). Some decisions have expressly phrased the legality requirement as whether "the transactions proposed in the forbidden [communication] are themselves illegal in any way." *Va. State Bd. of Pharmacy*, 425 U.S. at 772; *see also Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638 (1985) ("The States and the Federal Government are free to prevent the dissemination of commercial speech that . . . proposes an illegal transaction . . . ."). Other decisions have used *Central Hudson*'s more general "related to unlawful activity" language. *Cent. Hudson*, 447 U.S. at 564; *see also Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623–24 (1995) ("Under *Central Hudson*, the government may freely regulate commercial speech that concerns unlawful activity . . . .").

However it is formulated, we think it clear that *Central Hudson*'s legality requirement requires us to evaluate the content of a commercial message rather than the means by which that message is conveyed. Here, that means that the plaintiffs have satisfied the requirement because it is legal to

hire or be hired for day labor. We find support for this conclusion both in *Pittsburgh Press*, the Supreme Court case upon which Arizona principally relies, and in the Supreme Court's explanation in *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383–84 (1992), of what it means for certain speech to be "excluded" from First Amendment protection.

*Pittsburgh Press*, the case from which *Central Hudson* drew its legality requirement, considered only the commercial transaction proposed by an advertisement. There, the Supreme Court held that a newspaper has no First Amendment right to publish a discriminatory employment advertisement. *See Pittsburgh Press*, 413 U.S. at 388–89. The Supreme Court reasoned that, just as it would be permissible to ban an advertisement for narcotics or prostitution, it was permissible to ban gender-specific job postings because sex discrimination in hiring is illegal. *See id.* at 388. The Court concluded that "[a]ny First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *Id.* at 389.

In *Pittsburgh Press*, unlike here, the affected speech proposed an illegal transaction – the discriminatory hiring of a worker. The day labor provisions, on the other hand, regulate speech proposing a legal transaction where the speech is conducted in an unlawful manner. Nothing in *Pittsburgh Press* or any other case Arizona cites suggests that we should expand our inquiry beyond whether the affected speech proposes a lawful transaction to whether the affected speech is conducted in a lawful manner. Moreover, the

Supreme Court's discussion in *R.A.V.* of categorical First Amendment exemptions cautions that such an expansion would be improper.

In *R.A.V.*, the Supreme Court discussed its approach to categorical exemptions from First Amendment scrutiny. It explained that, although it has sometimes said that the "protection of the First Amendment does not extend" to certain categories of speech, that statement is not "literally true." *R.A.V.*, 505 U.S. at 383 (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 504 (1984)). Instead, what a categorical exclusion means is that, "these areas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content*." *Id.* The proposal of an illegal transaction is, like the obscenity and defamation discussed in *R.A.V.*, categorically exempted from First Amendment protection because it lacks social value. *See United States v. Williams*, 553 U.S. 285, 297 (2008) ("Offers to engage in illegal transactions are categorically excluded from First Amendment protection." (citing *Pittsburgh Press*, 413 U.S. at 388)). The basis of this categorical exclusion is the *content* of the speech, not the manner in which that speech is conducted. *See id.* ("[O]ffers to give or receive what it is unlawful to possess have no social value and thus, like obscenity, enjoy no First Amendment protection." (citing *Pittsburgh Press*, 413 U.S. at 387–89)). Thus, in deciding whether to apply a categorical exception, we look to the content of a communication rather than the method of that communication. Here, the content of the communication – the solicitation of labor – is perfectly legal.

This approach fits with *R.A.V.*'s ultimate lesson, which is that government may not leverage its power to regulate one

sphere of activity into the ability to favor certain speech within that sphere. So, though a state may ban all fighting words, it may not ban only those fighting words that invoke race, color, creed, religion or gender. *See R.A.V.*, 505 U.S. at 391–96. Similarly, the government may prohibit all outdoor fires, but it may not specifically prohibit flag burning. *Id.* at 385 ("[B]urning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not." (citing *Texas v. Johnson*, 491 U.S. 397, 406–07 (1989))). In the commercial speech context, *R.A.V.* noted that, though a state may "regulate price advertising in one industry but not in others, because the risk of fraud . . . is in its view greater there," it "may not prohibit only that commercial advertising that depicts men in a demeaning fashion." *Id.* at 388–89 (citations omitted).

Arizona may prohibit pedestrians and motorists from blocking traffic, and it has done so. *See* Ariz. Rev. Stat. § 13-2906(A) (imposing criminal penalties for one who "recklessly interferes with the passage of any highway or public thoroughfare by creating an unreasonable inconvenience or hazard"). But as we discuss below, it may not, consistent with the First Amendment, use a content-based law to target individuals for lighter or harsher punishment because of the message they convey while they violate an unrelated traffic law. Such disparate treatment implicates the First Amendment.

In sum, it is legal in Arizona to hire or be hired for day labor. The day labor provisions limit the ability of day laborers and employers to solicit, negotiate and consummate that legally permissible transaction. The district court therefore correctly held that the day labor provisions are

subject to First Amendment scrutiny as restrictions on lawful, nonmisleading speech.

## B.  Arizona Has Satisfied *Central Hudson*'s Second Prong by Demonstrating that it Has a Substantial Interest in Traffic Safety

Arizona asserts that the day labor provisions are justified by the state's desire to promote traffic safety.[4]  Promoting traffic safety is undeniably a substantial government interest. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–08 (1981) (holding that there can be no "substantial doubt that the twin goals that the ordinance seeks to further – traffic safety and the appearance of the city – are substantial governmental goals").  Arizona has therefore satisfied *Central Hudson*'s substantial governmental interest requirement.

## C.  The District Court's Determination that the Day Labor Provisions Directly Advance Arizona's Interest in Traffic Safety Was Not an Abuse of Discretion

*Central Hudson*'s third prong requires that a restriction on commercial speech must "directly advance" the state's substantial interest.  *Cent. Hudson*, 447 U.S. at 564.  One "consideration in the direct advancement inquiry is 'underinclusivity . . . .'"  *Metro Lights*, 551 F.3d at 904.

---

[4] Arizona identifies several other substantial interests, including crime reduction, economic development and protecting the aesthetics of its communities.  As before the district court, Arizona identifies these interests as substantial but fails to argue that the day labor provisions are narrowly tailored to achieve them.  We therefore decline to address these additional interests.

"*Central Hudson* requires a logical connection between the interest a law limiting commercial speech advances and the exceptions a law makes to its own application." *Id.* at 905. We term a law that distinguishes among types of commercial speech without such a logical connection "underinclusive." As we discuss here, underinclusivity is relevant to *Central Hudson*'s direct advancement prong because it "may diminish the credibility of the government's rationale for restricting speech in the first place." *Id.* at 904–05 (quoting *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994)). As we discuss in Section II.D, *infra*, underinclusivity is also relevant to *Central Hudson*'s narrow tailoring prong.

Above, we held that the day labor provisions are content-based because they distinguish between day labor solicitation speech and all other types of roadside solicitation. In *Ballen v. City of Redmond*, 466 F.3d 736 (9th Cir. 2006), we struck down an ordinance that prohibited many commercial signs but exempted real estate signs, because "[t]he City . . . failed to show how the exempted signs reduce vehicular and pedestrian safety or besmirch community aesthetics any less than the prohibited signs." *Id.* at 743. The adoption of a content-based restriction, absent justification, "indicate[d] that the City ha[d] not carefully calculated the costs and benefits associated with the burden on speech." *Id.*

The day labor provisions, however, are not automatically underinclusive simply because they are content-based and fail to regulate all forms of roadside communication. *See Metro Lights*, 551 F.3d at 910 (noting that a regulation that bans some, but not all, advertising signs is not automatically underinclusive). Similarly, Arizona may discriminate between different types of roadside communication if it determines that roadside labor solicitations present more

acute safety concerns than other roadside communications. *See id.* (holding that the additional danger posed by "uncontrolled and incoherent proliferation" of offsite signs was sufficient justification for treating uncontrolled offsite advertising differently from regulated advertising at transit stops).    Finally, Arizona may consider the benefits of different types of roadside communications when determining which communications to restrict.    *See id.* at 910–11 (respecting city's decision that the value it derives from one form of advertising, but not another, "is stronger than the city's interests in traffic safety and esthetics." (quoting *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 512 (1981))).

Arizona does not argue that day labor solicitation is less valuable than other types of roadside solicitation. The inquiry is therefore whether anything in the record supports Arizona's assertion that day labor solicitation creates more acute traffic safety concerns than other types of roadside communication. The plaintiffs say no, arguing that jaywalking, protesting, selling food or goods at the side of the road and a number of other activities present the same traffic concerns as day labor solicitation but are unregulated by the day labor provisions. Arizona counters that the *plaintiffs'* assertion is the one unsupported by the record, which includes news articles, declarations and photographs of day laborers and vehicles blocking traffic. We take the point that day labor solicitation may create traffic safety concerns.    This evidence is nonprobative, however, on the key question of whether those concerns are more acute than the traffic safety concerns caused by other types of roadside communication.

Arizona introduced declarations from two former police officers explaining the particular traffic problems caused by

day laborer solicitation. Most of the officers' declarations discuss the hazards of roadside pedestrian-motorist communications generally; while they would support penalizing pedestrian-motorist interactions generally, they do not support singling out day labor solicitation. One officer did, however, represent that day laborer interactions require the parties to negotiate multiple terms, and so take longer than other types of in-street solicitation. Whether this statement is admissible, accurate or generally applicable is far from clear, but at this stage of the proceedings we must accept it as an asserted fact that might justify harsher sanctions than for other roadside speech that blocks traffic.

The district court applied the correct legal standard and determined that the day labor provisions, while "underinclusive to some degree," still ban enough traffic-blocking solicitation that they directly advance Arizona's interest in traffic safety. Although the evidence was weak, the court's conclusion was not an abuse of discretion.

## D. There Is a Substantial Likelihood that Plaintiffs Will Succeed on Their Claim that the Day Labor Provisions Restrict More Speech than Necessary to Serve Arizona's Interest in Traffic Safety

Finally, *Central Hudson* requires that a regulation "is not more extensive than is necessary to serve" a substantial government interest. 447 U.S. at 566. The test is sometimes phrased as requiring a "'reasonable fit' between [government's] legitimate interests" and the means it uses to serve those interests, *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 416 (1993), or that the government employ a "means narrowly tailored to achieve the desired objective," *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S.

469, 480 (1989). The district court concluded that the plaintiffs had established a likelihood of success on their claim that the day labor provisions are not "drawn to achieve" Arizona's substantial interest in traffic safety. The court derived this standard from *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2667–68 (2011), which held that "[t]o sustain [a] targeted, content-based burden . . . on protected expression, the State must show at least that . . . the measure is drawn to achieve that interest." The parties debate whether this standard is more stringent than *Central Hudson*'s formulation that a restriction must be no "more extensive than is necessary to serve that interest." *Cent. Hudson*, 447 U.S. at 566. At the least, *Sorrell* articulates the test the Supreme Court most recently applied to a content-based restriction on commercial speech, so the district court did not err in applying it. Whether *Sorrell* intended to make the commercial speech test more exacting for the state to meet is a question that we need not decide, because we conclude plaintiffs are likely to succeed even under *Central Hudson*'s formulation of the standard and our cases interpreting it.

Under those decisions, a restriction on commercial speech "must not be more extensive than is necessary to serve" a substantial government interest – i.e., it should not be *overinclusive*. *World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 684 (9th Cir. 2010) (quoting *Metro Lights*, 551 F.3d at 903) (internal quotation marks omitted). We recently evaluated a similar in-street solicitation ban and held it to be impermissibly overinclusive. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach (Redondo Beach)*, 657 F.3d 936, 950 (9th Cir. 2011) (en banc). *Redondo Beach* applied the "time, place or manner" test for content-neutral restrictions on core First Amendment speech. *Id.* at 945. Like *Central Hudson*'s for restrictions on

commercial speech, that test requires that a regulation be narrowly tailored to serve a significant government interest. *See id.* at 948 ("To satisfy the [time, place or manner] narrow tailoring requirement, 'the Government . . . bears the burden of showing that the remedy it has adopted does not burden substantially more speech than is necessary to further the government's legitimate interests.'" (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994))). Because the test for commercial speech is "'substantially similar' to the application of the test for validity of time, place, and manner restrictions," *Redondo Beach* provides a helpful framework for analyzing this case. *Fox*, 492 U.S. at 477 (quoting *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 537 n.16 (1987)).

In *Redondo Beach*, as here, the government sought to justify an in-street solicitation ban by its interest in traffic flow and safety. *Redondo Beach*, 657 F.3d at 947. The ban applied to all in-street solicitation, regardless of whether the solicitation blocked traffic. *See id.* at 941–42. We recognized, as we do here, that traffic safety is an important government interest and that solicitation may create dangerous traffic conditions. *See id.* at 947–48. Nevertheless, we held that Redondo Beach's law was overinclusive because it restricted more speech than necessary to serve Redondo Beach's interest in traffic safety. *See id.* at 947–51.

Arizona's law is less restrictive than Redondo Beach's because the day labor provisions regulate only labor solicitation that blocks traffic, whereas Redondo Beach's ordinance regulated all roadside solicitation. Nevertheless, one line of analysis from *Redondo Beach* is highly relevant and persuasive. The Redondo Beach ordinance restricted

more speech than necessary because "[t]he City has various other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech." *Id.* at 949. That holding was based on the longstanding rule that, because restricting speech should be the government's tool of last resort, the availability of obvious less-restrictive alternatives renders a speech restriction overinclusive. *See id.* at 950 (citing *Discovery Network*, 507 U.S. at 417 n.13 ("[I]f there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable."); *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980) ("The Village's legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on solicitation. Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly."); *Schneider v. New Jersey*, 308 U.S. 147, 162 (1939) ("There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets.")).

Plaintiffs have cited a number of preexisting Arizona laws that could be used to address legitimate traffic safety concerns without burdening speech. These include Arizona Revised Statutes Sections 28-873(A) (civil penalties for stopping or parking a car in various situations), 28-905 (civil penalties for opening a car door if it interferes with traffic), and 13-2906(A) (criminal penalties for one who "recklessly interferes with the passage of any highway or public thoroughfare by creating an unreasonable inconvenience or hazard."). Arizona responds that "the existing traffic laws had insufficient or no deterrent effect on in-street

employment solicitation." This argument misses the point and is in any event unsupported.

First, Arizona's substantial government interest is in traffic flow and safety, not in curbing in-street employment solicitation. The question is therefore not whether existing laws are sufficient to deal with in-street employment solicitation, but rather whether existing laws are sufficient to deal with *the traffic problems* that may attend in-street employment solicitation. Arizona, which bears the burden of proof on this issue, has introduced no evidence addressing it.

Second, our consideration is not limited to Arizona's actual traffic safety regulations, but includes any potential or actual traffic safety regulations that are obviously available. *See, e.g.*, *Discovery Network*, 507 U.S. at 417 ("The fact that the city failed to address its recently developed concern about newsracks by regulating their size, shape, appearance, or number indicates that" the restriction was not narrowly tailored). As discussed above, *Redondo Beach* identified a number of existing laws the city could have invoked that were broad enough to address the traffic concerns attending in-street employment solicitation without implicating speech. *See Redondo Beach*, 657 F.3d at 949–50 (citing California ordinances prohibiting jaywalking, stopping in traffic alongside a red-painted curb, stopping a car "so as to obstruct the normal movement of traffic," standing in a roadway "if such action interferes with the lawful movement of traffic" and standing or stopping "except as near as is physically possible to the building line or the curb line"). Our discussion in *Redondo Beach* highlights the animating First Amendment principle that government must consider pursuing its interests through conduct-based regulations before enacting speech-based regulations.

Nothing in the record shows that Arizona could not effectively pursue its interest in traffic safety by enforcing or enacting similar kinds of speech-neutral traffic safety regulations. Therefore, even under the *Central Hudson* standard Arizona urges, plaintiffs are likely to succeed on the merits of their claim that the day labor provisions are *overinclusive* because they restrict more speech than necessary to serve Arizona's interest in traffic safety.[5]

The day labor provisions are a poor fit with Arizona's interest in traffic safety because, in this context, they are also *underinclusive*. As we previously discussed, the district court did not abuse its discretion in concluding that the day labor provisions are underinclusive but not so much so that they fail to directly advance Arizona's interest in traffic safety. That the day labor provisions are underinclusive is still relevant, however, to whether they satisfy *Central Hudson*'s no-more-extensive-than-necessary prong. The district court correctly noted the relevance of underinclusivity to this inquiry and correctly determined that the provisions' underinclusivity contributes to the plaintiffs' likelihood of success on the merits. *See Metro Lights*, 551 F.3d at 905 n.8 (explaining that underinclusivity is relevant to both whether a speech restriction directly advances the government's interest and whether it is more extensive than necessary).

A statute that "discriminat[es] on the basis of content" may be "'more extensive than necessary' to advance the government's interest" if there is no valid reason for the

---

[5] We reiterate that we consider only the limited record before us and only as a predictive matter at the preliminary injunction stage. Nothing in our opinion should be read as foreclosing the parties from introducing additional evidence as this case proceeds.

discrimination. *Id.* (quoting *Cent. Hudson*, 447 U.S. at 566) (citing *Ballen*, 466 F.3d at 743–44). In *Ballen*, we held that, where there is no reason related to the government's asserted interest for distinguishing based on content, a content-based law restricts more speech than necessary because it indicates that the government "has not carefully calculated the costs and benefits associated with the burden on speech imposed by its discriminatory, content-based prohibition." 466 F.3d at 743.

The day labor provisions are content-based restrictions designed to suppress the economic activity of undocumented immigrants. Unlike in *Ballen*, Arizona has proffered at least some legitimate basis for distinguishing between day labor solicitation and other roadside communications. *See* Section II.C, *supra*. As noted, however, that justification is only marginally supported by the record. In its narrow tailoring analysis, the district court correctly discounted it and emphasized S.B. 1070's purposes clause, the fact that the day labor provisions provide penalties drastically out-of-proportion to those for other traffic violations and the legislative record. These factors all support the court's conclusion that the day labor provisions are underinclusive because they are "structured to target particular speech rather than a broader traffic problem." That conclusion, whether under *Central Hudson* or *Sorrell*, undercuts Arizona's argument that the day labor provisions are narrowly tailored to serve its interest in traffic safety.

In sum, Arizona could have advanced its interest in traffic safety directly, without reference to speech. The availability of such obvious and less-restrictive alternatives makes the day labor provisions overinclusive. They are also underinclusive because they draw content-based distinctions

that appear motivated by a desire to eliminate the livelihoods of undocumented immigrants rather than to address Arizona's interest in traffic safety. Being both overinclusive and underinclusive, the day labor provisions restrict more speech than necessary to serve Arizona's interest in traffic safety. The district court correctly determined that plaintiffs are likely to succeed on the merits of their First Amendment claim.

## III.

In addition to likelihood of success on the merits, a court granting a preliminary injunction must consider the likelihood of irreparable harm in the absence of preliminary relief, the balance of equities and the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The district court considered each of these factors. Its conclusion that plaintiffs would suffer irreparable harm in the absence of an injunction was appropriate because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The court correctly found that the equities tip in favor of the plaintiffs because they have a significant First Amendment and economic interest in engaging in solicitation speech and Arizona need not impede that speech in order to pursue its traffic safety goals. Finally, the court correctly found that an injunction is in the public interest because the day labor provisions, if enforced, would infringe the First Amendment rights of many persons who are not parties to this lawsuit.

## CONCLUSION

Laws that limit commercial speech must not be more extensive than necessary to serve a substantial government interest. The district court correctly determined that, though Arizona has a significant government interest in promoting traffic safety, the day labor provisions fail *Central Hudson*'s requirement that restrictions on commercial speech be no more extensive than necessary to serve that interest. The district court did not abuse its discretion in concluding that the plaintiffs are likely to succeed on the merits and that the other requirements for a preliminary injunction are satisfied. We therefore affirm the preliminary injunction barring enforcement of the day labor provisions.

**AFFIRMED**