**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

RETAIL DIGITAL NETWORK, LLC,
*Plaintiff-Appellant*,

v.

JACOB APPELSMITH, as Director of
the Alcoholic Beverage Control
Board,
*Defendant-Appellee*.

No. 13-56069

D.C. No.
2:11-cv-09065-
CBM-PJW

OPINION

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, Senior District Judge, Presiding

Argued and Submitted
June 3, 2015—Pasadena, California

Filed January 7, 2016

Before: Sidney R. Thomas, Chief Judge, Consuelo M.
Callahan, Circuit Judge and Edward R. Korman,[*] Senior
District Judge.

Opinion by Judge Callahan

---

[*] The Honorable Edward R. Korman, Senior District Judge for the U.S. District Court for the Eastern District of New York, sitting by designation.

# SUMMARY**

### Civil Rights

The panel reversed the district court's summary judgment in favor of the Director of the California Department of Alcoholic Beverage Control, and remanded in an action in which plaintiff challenged, on First Amendment grounds, California Business and Professions Code Section 25503(f)–(h), which forbids manufacturers and wholesalers of alcoholic beverages from giving anything of value to retailers for advertising their alcoholic products.

The panel first held that plaintiff Retail Digital Network, a middleman involved in the advertising industry, had standing to challenge section 25503. The panel held that the Supreme Court's opinion in *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011), requires heightened judicial scrutiny of content-based restrictions on non-misleading commercial speech regarding lawful products, rather than the intermediate scrutiny previously applied to section 25503 by the Ninth Circuit in *Actmedia, Inc. v. Stroh*, 830 F.2d 957 (9th Cir. 1986). The panel held that *Actmedia* was clearly irreconcilable with the Supreme Court's intervening decision in *Sorrell*. The panel therefore reversed the district court's summary judgment, which had found *Actmedia* to be controlling, and remanded on an open record for the district court to apply heightened judicial scrutiny in the first instance.

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Olivier A. Taillieu (argued) and Raffi V. Zerounian, The Taillieu Law Firm, Beverly Hills, California, for Plaintiff-Appellant.

Kamala D. Harris, Attorney General, Alicia M. B. Fowler, Senior Assistant Attorney General, Jerald L. Mosley, Supervising Deputy Attorney General, and Gabrielle H. Brumbach (argued), Deputy Attorney General, Los Angeles, California, for Defendant-Appellee.

**OPINION**

CALLAHAN, Circuit Judge:

California Business and Professions Code Section 25503(f)–(h) forbids manufacturers and wholesalers of alcoholic beverages from giving anything of value to retailers for advertising their alcoholic products. Thus, for example, a liquor store owner in California can hang a Captain Morgan Rum sign in his store's window, but the Captain can't pay him, directly or through an agent, for doing so. Twenty-nine years ago, in *Actmedia, Inc. v. Stroh*, 830 F.2d 957 (9th Cir. 1986), we found this law to be consistent with the First Amendment. Today we consider whether *Actmedia* remains binding in light of intervening Supreme Court decisions, which Plaintiff-Appellant Retail Digital Network, LLC (RDN) contends have strengthened the protection we must give commercial speech under the First Amendment.

We conclude that *Actmedia* is clearly irreconcilable with *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011). *Sorrell*

requires heightened judicial scrutiny of content-based restrictions on non-misleading commercial speech regarding lawful products, rather than the intermediate scrutiny applied to section 25503 in *Actmedia*. We therefore reverse the district court's summary judgment in favor of Defendant-Appellee Jacob Appelsmith, Director of the California Department of Alcoholic Beverage Control (the State), and remand on an open record for the district court to apply heightened judicial scrutiny in the first instance.

## I.

## A.  California Business & Professions Code Section 25503

Section 25503 is part of a scheme of "tied-house" statutes passed by the California legislature in the wake of Prohibition.

The name "tied-house" derives from a perceived evil that the scheme was designed to defeat:  the return of saloons and other retail alcoholic beverage outlets controlled by alcoholic beverage manufacturers and wholesalers that had been prevalent during the early 1900s. *See Actmedia*, 830 F.2d at 959–61; *Cal. Beer Wholesalers Ass'n v. Alcoholic Beverage Control Appeals Bd.*, 5 Cal. 3d 402, 407 (1971). Manufacturers and wholesalers "tied" retailers to them by providing them with low-interest loans, reduced rents, and free equipment, employing their staff, and other means. *See Actmedia*, 830 F.2d at 960; *see also Pickerill v. Schott*, 55 So. 2d 716, 719 (Fla. Sup. Ct. 1951). Lawmakers in Congress, California, and other states blamed "the industry structure that tied-house arrangements created . . . . for producing monopolies and exclusive dealing arrangements, for causing a vast growth in the number of saloons and bars, for fostering

commercial bribery, and for generating other 'serious social and political evils,' including political corruption, irresponsible ownership of retail outlets, and intemperance." *Actmedia*, 830 F.2d at 960 n.2 (quoting S. Rep. No. 1215, 74th Cong., 1st Sess. 2, 6–7 (1935)); *see also Nat'l Distrib. Co. v. U.S. Treasury Dep't*, 626 F.2d 997, 1009–10 (D.C. Cir. 1980).

To prevent vertical and horizontal integration of the alcoholic beverage industry and to promote temperance, the California legislature prohibited manufacturers and wholesalers from owning retailers or making gifts, paying rebates, or otherwise buying the favor of retailers and their employees. *See, e.g.*, Cal. Bus. & Prof. Code §§ 25500, 25503(a)–(e). Section 25503(f)–(h), the provision challenged on First Amendment grounds here, was designed to "prevent manufacturers and wholesalers from circumventing these other tied-house restrictions by claiming that the illegal payments they made to retailers were for 'advertising.'" *Actmedia*, 830 F.2d at 967. In relevant part, section 25503(f)–(h) forbids manufacturers and wholesalers of alcoholic beverages, including their agents, from providing retail establishments with anything of value for the privilege of advertising their alcoholic products.[1]

---

[1] The statute provides:

> No manufacturer, winegrower, manufacturer's agent, California winegrower's agent, rectifier, distiller, bottler, importer, or wholesaler, or any officer, director, or agent of any such person, shall do any of the following: . . . .
>
> (f) Pay, credit, or compensate a retailer or retailers for advertising, display, or distribution service in

California was not alone in passing tied-house laws. Congress and "the 'vast majority of states' enacted [similar] alcohol beverage control laws" following the repeal of the Eighteenth Amendment. *Actmedia*, 830 F.2d at 959 n.1 (quoting *Cal. Beer Wholesalers Ass'n*, 5 Cal. 3d at 407). California's concern that advertising payments could be used to conceal illegal payoffs to retailers also "appears to have been widely held at the time of section 25503(h)'s enactment." *Id.* at 960. Congress, for example, passed a similar law barring manufacturers and distributors of alcoholic beverages from "paying or crediting the retailer for any advertising, display, or distribution service." 27 U.S.C. § 205(b)(4).

## B. *Actmedia, Inc. v. Stroh*

Our court addressed section 25503(h)'s constitutionality under the First Amendment in *Actmedia, Inc. v. Stroh*., 830 F.2d 957 (9th Cir. 1986). Actmedia, a corporation whose business consisted of leasing advertising space on supermarket shopping carts, challenged section 25503(h) as

---

connection with the advertising and sale of distilled spirits.

(g) Furnish, give, lend, or rent, directly or indirectly, to any person any decorations, paintings, or signs, other than signs advertising their own products as permitted by Section 25611.1.

(h) Pay money or give or furnish anything of value for the privilege of placing or painting a sign or advertisement, or window display, on or in any premises selling alcoholic beverages at retail.

Cal. Bus. & Prof. Code § 25503.

an impermissible restriction on commercial speech. Following trial, the district entered judgment for the State and dismissed Actmedia's claims.

On appeal, we applied the test for laws that burden commercial speech set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). Under that test, courts examine four questions: (1) whether the speech concerns lawful activity and is not misleading; (2) whether the asserted governmental interest justifying the regulation is substantial; (3) whether the regulation directly advances the governmental interest asserted; and (4) whether the regulation is not more extensive than is necessary to serve that interest. *Id.* at 566.

We found "little dispute concerning the first two factors of the *Central Hudson* analysis." *Actmedia*, 830 F.2d at 965. First, the ads "concern[ed] lawful activity and [were] not . . . misleading. Thus, they constitute[d] protected commercial speech under the [First Amendment]." *Id.* (quotation marks omitted). Second, the State "ha[d] a 'substantial' interest in exercising its twenty-first amendment powers and regulating the structure of the alcoholic beverage industry in California: the activities of manufacturers, wholesalers, and retailers in the state; the methods by which alcoholic beverages are marketed; and influences that affect the consumption levels of alcoholic beverages by California residents." *Id.* at 965–66.

Addressing the third *Central Hudson* factor, we concluded that "section 25503(h) furthers California's purposes both of limiting the ability of large alcoholic-beverage manufacturers and wholesalers to achieve vertical and horizontal integration by acquiring influences

over the state's retail outlets, and of promoting temperance."
*Id.* at 966. We explained that the provision eliminated a
loophole potentially left open by California's other tied-house
laws, through which manufacturers and wholesalers might
use advertisement payments to buy the favor of retailers and
their employees. *Id.* at 967. "Because prohibiting
alcoholic-beverage manufacturers and wholesalers from
paying retailers to advertise in their stores will eliminate any
danger that such payments will be used to conceal illegal
payoffs and violations of the tied-house laws, we conclude[d]
that section 25503(h) furthers the same interests that led
California to enact the tied-house laws." *Id.* We also
reasoned that "in reducing the quantity of advertising that is
seen in retail establishments selling alcoholic beverages, the
provision also directly furthers California's interest in
promoting temperance." *Id.*

Addressing the fourth *Central Hudson* factor, we
concluded that "section 25503(h)'s blanket prohibition of
paid advertising in retail establishments appears to be as
narrowly drawn as possible to effectuate [the provision's]
first purpose," that being "to prevent illegal payments from
being channelled by alcoholic-beverage manufacturers and
wholesalers to retailers." *Id*. We also found that section
25503(h) is not more extensive than necessary to achieve the
provision's "second purpose[,] . . . to promote temperance,
both indirectly, by limiting vertical integration of the
alcoholic-beverage industry and its side effects, and directly,
by reducing the amount of point-of-purchase advertising." *Id.*
We reasoned that "to the extent that the California legislature
has determined that point-of-purchase advertising is a direct
cause of excessive alcohol consumption, limiting that
advertising is 'obviously the most direct and perhaps the only
effective approach' available." *Id.* (quoting *Metromedia,*

*Inc. v. City of San Diego*, 453 U.S. 490, 508 (1981)). We thus held that section 25503(h) survived intermediate scrutiny.

## C.  RDN's Suit

Like the plaintiff in *Actmedia*, RDN is a middleman involved in the advertising industry. RDN installs liquid crystal displays, or LCDs, in retail stores for advertisements and then enters into contracts with other parties who want to advertise their products on the displays. In exchange for placing a display in a retail store, RDN pays the store a percentage of the advertising fees generated by the display. RDN states that it has attempted to enter into contracts with manufacturers to advertise their alcoholic beverages on RDN's displays in California. According to RDN, the manufacturers have refused due to concerns that the advertising would violate section 25503(f)–(h).

RDN filed this action on November 1, 2011, seeking declaratory relief that section 25503(f)–(h) is unconstitutional under the First Amendment, and an injunction against the State's enforcement of the law. The State moved for summary judgment and, at a hearing on that motion, RDN agreed "that the Ninth Circuit's decision in *Actmedia* . . . leaves 'no room for this litigation' except to the extent that a trio of subsequent Supreme Court decisions is clearly irreconcilable with its conclusions." *RDN v. Appelsmith*, 945 F. Supp. 2d 1119, 1123 (C.D. Cal. 2013). Specifically, RDN argued that *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995), *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) (plurality opinion), and, most definitively, *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011), overrule *Actmedia.* According to RDN, these cases require heightened judicial

scrutiny of laws burdening non-misleading commercial speech regarding legal products, which section 25503 cannot survive.

The district court first found that RDN had standing to challenge section 25503 based on injury to its economic interest in the advertising of alcoholic beverages that section 25503 burdens . *RDN*, 945 F. Supp. 2d at 1122–23. On the merits, the district court found that section 25503 is a content- and speaker-based restriction on commercial speech, but held that the law is constitutional under *Actmedia*. *Id.* at 1125–26.

The district court acknowledged that, after *Actmedia*, the Supreme Court stated that heightened judicial scrutiny is warranted "whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.'" *Id*. at 1125 (quoting *Sorrell,* 131 S. Ct. at 2664). But the district court found that *Sorrell* was consistent with *Actmedia*'s analytical framework for four reasons. First, *Sorrell* "cited to a previous Supreme Court decision applying *Central Hudson.*" *RDN*, 945 F. Supp. 2d at 1125. Second, *Sorrell* applied the *Central Hudson* test rather than heightened judicial scrutiny after noting that, "[a]s in previous cases, . . . the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied." *RDN*, 945 F. Supp. 2d at 1125 (quoting *Sorrell*, 131 S. Ct. at 2667). Third, the majority in *Sorrell* did not define heightened scrutiny. *RDN*, 945 F. Supp. 2d at 1125. And fourth, "the dissenting opinion by Justice Breyer (and joined by Justices Ginsburg and Kagan), notes that the majority opinion suggests but does not hold that a standard stricter than the traditional *Central Hudson* test might be applied to content-based restrictions." *Id*. (citing *Sorrell*, 131 S. Ct. at 2677 (Breyer, J., dissenting)). The district court

also reasoned that, "[e]ven assuming *arguendo* that *Sorrell* established a heightened level of scrutiny for complete speech bans founded on paternalistic motivations," *Actmedia* is not clearly irreconcilable because section 25503 does not completely ban any speech. *Id*. at 1125.

Accordingly, the district court did not examine section 25503 under *Sorrell*'s heightened judicial scrutiny or reexamine the law under intermediate scrutiny. Rather, it found that *Actmedia* remained controlling and thus granted summary judgement in favor of the State. *Id*. at 1125–26.

## II.

### A.  Standing

Like the district court, we begin by determining whether RDN has standing. The State's silence about this issue on appeal does not excuse us from satisfying ourselves of our jurisdiction. *See, e.g.*, *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 963 (9th Cir. 2015) (en banc). To establish Article III standing, a plaintiff bears the burden of showing injury in fact, causation, and redressability. *See Bennett v. Spear*, 520 U.S. 154, 167 (1997). We agree with the district court that RDN's asserted loss of advertising revenue resulting from section 25503 meets this burden.

Our analysis does not end here. Several prudential principles that underscore the limitations embodied in Article III may bar standing even where, as here, the requirements of Article III have been met. "One of these prudential limits on standing is that a litigant must normally assert his own legal

interests rather than those of third parties."[2]    *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985).  This "general rule [that] a third party does not hav[e] standing to bring a claim asserting a violation of someone else's rights" adheres even where those rights are constitutional in stature. *Martin v. Cal. Dep't of Veterans Affairs*, 560 F.3d 1042, 1050 (9th Cir. 2009); *see also Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 49 (1st Cir. 2005) ("A party ordinarily has no standing to assert the First Amendment rights of third parties.").

In the commercial-speech context, the Supreme Court has held that the "individual parties to the transaction that is proposed in the commercial advertisement"—the advertiser and the consuming public—have protected First Amendment interests in the speech proposing the transaction. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762–63 (1976).  The Court has distinguished between the proposal of a commercial transaction, "which is what defines commercial speech," and the provision of services for profit, which is not commercial speech. *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480–81 (1989).

While an advertisement about an alcoholic beverage clearly constitutes commercial speech, *see 44 Liquormart*, 517 U.S. at 495 (opinion of Stevens, J.), *id.* at 528 (O'Connor, J., concurring), RDN is not a manufacturer or

---

[2] We need not address whether the label "prudential standing" is a misnomer as applied to the third-party standing analysis, as we find that RDN's claim may proceed regardless of the doctrine's rubric.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 n.3 (2014).

retailer seeking to hawk its wares, or a consumer looking to buy. Rather, RDN is interested in profiting from facilitating the publication of alcoholic beverage advertisements. In the circumstances presented, however, where RDN could face criminal penalties for placing advertisements of particular content on its retail displays paid for by alcoholic beverage manufacturers, we find that RDN may bring a First Amendment challenge to the law proscribing its conduct. *See* Cal. Bus. & Prof. Code § 25503 (prohibiting an "agent" of a manufacturer, wholesaler, or other listed entity from providing anything of value to retailers for the privilege of advertising); *id.* § 25504 (listing penalties); *cf. Dep't of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.*, 128 Cal. App. 4th 1195, 1208 (Ct. App. 2005), *as modified* (May 13, 2005) (holding that section 25503(h) prohibits "indirect payments by suppliers to retailers" through promoters).

Our conclusion finds support in the principle that "when [a] threatened enforcement effort implicates First Amendment rights, the [standing] inquiry tilts dramatically toward a finding of standing." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000). Indeed, the Supreme Court has found that a plaintiff threatened with criminal prosecution for violating a law imposing a content-based burden on commercial speech may challenge that law under the First Amendment, even though the speech of third parties is more directly at stake. *Bigelow v. Virginia*, 421 U.S. 809, 815–18 (1975) (holding that a newspaper publisher who had been convicted of violating a state statute outlawing advertising regarding abortion services had standing to challenge the law on First Amendment grounds).

The Court also has held that a publisher whose business conduct was directly regulated by a law imposing a content-based burden on commercial speech could challenge that law under the First Amendment. In *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Board*, 502 U.S. 105, 109 (1991), the Court held that a publisher, Simon & Schuster, had standing to challenge a law that imposed a financial disincentive on one of its authors to write a book about a career criminal named Henry Hill. Under a contract with Simon & Schuster, Hill was entitled to compensation, but New York's "Son of Sam" law required that these funds be held in escrow for five years for use in satisfying any civil judgments obtained by the victims of Hill's crimes. Pursuant to this law, the New York State Crime Victims Board ordered Simon & Schuster to turn over all money payable to Hill. *Id.* at 115. The Court found that Simon & Schuster had standing to challenge the Son of Sam law under the First Amendment. The Court reasoned that "[w]hether the First Amendment 'speaker' is considered to be Henry Hill, whose income the statute places in escrow because of the story he has told, or Simon & Schuster, which can publish books about crime with the assistance of only those criminals willing to forgo remuneration for at least five years, the statute plainly imposes a financial disincentive only on speech of a particular content." *Id.*; *see also Pitt News v. Pappert*, 379 F.3d 96, 105–06 (3d Cir. 2004) (Alito, J.) (holding that a newspaper had standing to challenge a law that prohibited the newspaper from receiving payments for running alcoholic beverage ads).

Similarly, section 25503 imposes a financial burden on a speaker based on the content of the speaker's expression. The law may be enforced against RDN as an agent facilitating that expression. Consequently, whether the commercial

"speaker" is considered to be RDN as a publisher or third-party alcoholic beverage manufacturers, distributors, and retailers whose speech RDN would display, RDN may challenge section 25503 on First Amendment grounds.

## B. First Amendment Protection of Commercial Speech After *Sorrell*

Turning to the merits, we first summarize how the protection given to commercial speech has evolved since 1986, when we last addressed section 25503's constitutionality under the First Amendment.

As noted, the Supreme Court defines commercial speech as that "which does 'no more than propose a commercial transaction.'" *Va. State Bd. of Pharmacy*, 425 U.S. at 762 (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385 (1973)). Such speech has long been given less protection under the First Amendment than other types of speech. *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001); *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 818 (9th Cir. 2013). Specifically, restrictions on commercial speech have been subject to intermediate scrutiny under the four-part test set forth in *Central Hudson*, 447 U.S. at 566. The burden is on the government to show that the elements of the test are satisfied. *44 Liquormart*, 517 U.S. at 504–05 (opinion of Stevens, J.). Consistent with *Central Hudson*, we have previously applied intermediate scrutiny to content-based and content-neutral regulations of commercial speech alike. *See, e.g.*, *Coyote Publ'g, Inc. v. Miller*, 598 F.3d 592, 599 n.10 (9th Cir. 2010) ("[W]hether or not the . . . regulation is content-based, the *Central Hudson* test still applies because of the reduced protection given to commercial speech.").

In *Sorrell*, however, the Supreme Court held that content- or speaker-based restrictions on non-misleading commercial speech regarding lawful goods or services must survive "heightened judicial scrutiny." 131 S. Ct. at 2664. The Court invalidated a Vermont law that restricted the sale, disclosure, and use of pharmacy records for marketing purposes. *Id*. at 2659. On its face, the law was content- and speaker-based. In fact, it had been enacted with the avowed purpose of "diminish[ing] the effectiveness of marketing by manufacturers of brand-name drugs." *Id.* at 2663. While the Court found that heightened judicial scrutiny of the law was required, the Court did not actually apply heightened scrutiny, as it found that the law could not withstand intermediate scrutiny under *Central Hudson*. *Id.* at 2667–68.

Consistent with *Sorrell*'s plain language, we rule that *Sorrell* modified the *Central Hudson* test for laws burdening commercial speech. Under *Sorrell*, courts must first determine whether a challenged law burdening non-misleading commercial speech about legal goods or services is content- or speaker-based. If so, heightened judicial scrutiny is required. *See Sorrell*, 131 S. Ct. at 2664.

Heightened judicial scrutiny may be applied using the familiar framework of the four-factor *Central Hudson* test.[3]

---

[3] The district court need not apply strict scrutiny, which requires the government to demonstrate that a challenged law "is justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2738 (2011). For the law to be crafted with sufficient precision to survive strict scrutiny, there must be no less restrictive means available to achieve the compelling governmental interest. *See, e.g.*, *Boos v. Barry*, 485 U.S. 312, 328–29 (1988). The Supreme Court knows the words, "strict scrutiny," and the *Sorrell* majority seems at pains to avoid them. *See Sorrell*, 131

With respect to the third *Central Hudson* factor, the government bears the burden of showing "that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Coors Brewing Co.*, 514 U.S. at 487. With respect to the fourth *Central Hudson* factor, the government bears a heavier burden of showing that the challenged law "is drawn to achieve [the government's substantial] interest." *Sorrell*, 131 S. Ct. at 2667–68. This inquiry first permits a district court to test the consistency between (a) the specific interests asserted by the government during litigation in addressing *Central Hudson*'s second prong and (b) the legislative purposes that the court finds actually animated a challenged law, as made explicit in the statute's text or evidenced by its history or design. *See Friendly House v. Whiting*, 846 F. Supp. 2d 1053, 1060–61 (D. Ariz. 2012), *aff'd sub nom*. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808 (9th Cir. 2013). Post hoc rationalizations for a restriction on commercial speech may not be used to sustain its constitutionality.

Second, after identifying the governmental interests that animate the challenged restriction, intermediate scrutiny—and, a fortiori, heightened scrutiny—demands a "fit between the legislature's ends and the means chosen to accomplish those ends." *Sorrell*, 131 S. Ct. at 2668 (quoting *Fox*, 492 U.S. at 480). This requirement is demanding under heightened scrutiny, but it is "something short of a least-restrictive-means standard" that the government must meet under strict judicial scrutiny. *See Fox*, 492 U.S. at 477. What is required is "a fit that is not necessarily perfect, but

S. Ct. at 2667 ("[T]he outcome is the same whether a special commercial speech inquiry or a *stricter form of judicial scrutiny* is applied.") (emphasis added).

reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served; that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective." *Id.* at 480.

"As in other contexts, these standards ensure . . . that the [government's] interests are proportional to the resulting burdens placed on speech," *Sorrell*, 131 S. Ct. at 2668, thus preventing "the government from too readily sacrific[ing] speech for efficiency." *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014) (alternation in original). These standards also check raw paternalism, ensuring "that the law does not seek to suppress a disfavored message" or "keep people in the dark for what the government perceives to be their own good." *Sorrell*, 131 S. Ct. at 2668, 2671. Indeed, at least when the audience of commercial speech consists of adult consumers in possession of their faculties, the fact "[t]hat the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Id.* at 2671.

Our conclusion that *Sorrell* modified the *Central Hudson* test is consistent with the decisions of other circuit courts applying *Sorrell*. Our sister circuits have agreed that *Sorrell* requires stricter judicial scrutiny of content-based restrictions on non-misleading commercial speech, though they may not have settled on the contours of this more demanding level of scrutiny.

The Eighth Circuit, for example, held that *Sorrell* "devised a new two-part test for assessing restrictions on commercial speech." *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1054 (8th Cir. 2014). "The first question to ask is whether the challenged speech restriction

is content- or speaker-based, or both. . . .  If a commercial speech restriction is content- or speaker-based, then it is subject to 'heightened scrutiny.'"  *Id*. at 1055.  The second step is to apply the appropriate level of scrutiny.  According to the Eight Circuit, because *Sorrell* "did not define what 'heightened scrutiny' means, . . . . [t]he upshot is that when a court determines commercial speech restrictions are content- or speaker-based, it should then assess their constitutionality under *Central Hudson*."  *Id.* at 1055.

The Second Circuit also has interpreted *Sorrell* to require heightened scrutiny of content- or speaker-based restrictions on commercial speech, which may be applied using the framework of the *Central Hudson* test.  *United States v. Caronia*, 703 F.3d 149, 164 (2d Cir. 2012).  The Seventh Circuit similarly observed that *Sorrell* requires "the government [to] establish that the challenged statute 'directly advances a substantial governmental interest and that the measure is drawn to achieve that interest.'"  *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 604 (7th Cir. 2012) (quoting *Sorrell*, 131 S. Ct. at 2667–68)).

The Third Circuit has suggested that *Sorrell* may require strict scrutiny of content-based burdens on commercial speech.  *King v. Governor of the State of N.J.*, 767 F.3d 216, 236 (3d Cir. 2014), *cert. denied sub nom. King v. Christie*, 135 S. Ct. 2048 (2015).  Citing *Sorrell*, the court noted that "[o]rdinarily, content-based regulations are highly disfavored and subjected to strict scrutiny."  *Id*.  However, the court did not apply strict scrutiny to the challenged content- and speaker-based restriction on "professional speech" because it found that the law did not "discriminat[e] on the basis of content [or speaker] in an impermissible manner."  *Id.* at 237.

Moreover, our holding is consistent with our non-binding decisions referenced by the parties. These decisions indicated that *Sorrell* requires a more demanding form of scrutiny of content- or speaker-based regulations on commercial speech than we have previously applied. *See Minority Television Project, Inc. v. FCC*, 676 F.3d 869, 881 n.8 (9th Cir. 2012), *vacated*, 704 F.3d 1009–10 (9th Cir. 2012) (order); *Jerry Beeman & Pharmacy Servs., Inc. v. Anthem Prescription Mgmt., LLC,* 652 F.3d 1085, 1101 n.17 (9th Cir. 2011), *vacated*, 741 F.3d 29 (9th Cir. 2014) (order).[4]

## C. *Actmedia* is No Longer Binding.

We next consider whether *Actmedia* remains binding after subsequent Supreme Court commercial speech decisions, including *Coors Brewing*, *44 Liquormart*, and *Sorrell*.

As a three-judge panel, we are bound by *Actmedia* unless it is "clearly irreconcilable" with intervening higher authority. *Miller v. Gammie,* 335 F.3d 889, 893 (9th Cir. 2003) (en banc). "This is a high standard." *Lair v. Bullock,* 697 F.3d 1200, 1207 (9th Cir. 2012). "It is not enough for there to be some tension between the intervening higher authority and prior circuit precedent." *Id.* at 1207. "Rather, the relevant court of last resort must have undercut the theory or reasoning

---

[4] Both of these decisions were vacated, and the subsequent decisions entered in the cases did not interpret *Sorrell*. In another case, we noted that "[t]he parties . . . raise[d] the challenging issue of whether *Sorrell*, 131 S. Ct. at 2664, 2667–68, made the fourth *Central Hudson* prong for content-based restrictions on commercial speech even more demanding for the state." *Valle Del Sol Inc.*, 709 F.3d at 821. But we "defer[red] extended discussion of *Sorrell*," after finding that the challenged "provisions [were] deficient under even the pre-*Sorrell,* arguably more government-friendly, precedent." *Id.*

underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller*, 335 F.3d at 900; *see also In re Flores*, 692 F.3d 1021, 1030–31 (9th Cir. 2012).

We do not find that *Coors Brewing*, 514 U.S. 476 (1995) (striking down a law prohibiting beer labels from displaying alcohol content), or *44 Liquormart*, 517 U.S. 484 (1996) (striking down a ban on all advertising of alcoholic beverage prices except for price tags), meets this high standard. *Coors Brewing* and *44 Liquormart* do not clearly undermine *Actmedia*'s reasoning—they also applied intermediate scrutiny under the *Central Hudson* test. Similarly, we held in *Lair v. Bullock* that our circuit precedent could not be eschewed where a subsequent Supreme Court decision had "only clarified and reinforced" the principles on which our prior decision relied. 697 F.3d at 1207. While *Coors Brewing* and *44 Liquormart* suggest that complete bans on particular commercial speech require a higher level of scrutiny, section 25503 is not a complete ban on advertisements of alcoholic beverages in retail stores.

We find, however, that *Sorrell* and *Actmedia* are clearly irreconcilable. As explained above, *Sorrell* modified the *Central Hudson* analysis by requiring heightened judicial scrutiny of content-based restrictions on non-misleading advertising of legal goods or services. The parties do not dispute that section 25503 is a content- and speaker-based restriction on commercial speech. As such, section 25503 is now subject to heightened judicial scrutiny, not the intermediate scrutiny applied in *Actmedia*. Thus, *Actmedia*'s "overall analytical framework" of intermediate scrutiny cannot be reconciled with *Sorrell*'s framework of heightened judicial scrutiny. *See Lair*, 697 F.3d at 1206.

We cannot distinguish *Sorrell* as a case involving a complete ban on commercial speech. *Sorrell* foreclosed this argument. The majority stated "that the distinction between laws burdening and laws banning speech is but a matter of degree and that the Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Sorrell*, 131 S. Ct. at 2664.

Our conclusion that *Sorrell* undercut the theory and reasoning underlying *Actmedia* in a way that makes the cases clearly irreconcilable is strengthened by *Actmedia*'s treatment of paternalistic policy. *Actmedia* held that California could, consistent with the First Amendment, promote temperance "directly . . . by reducing the amount of point-of-purchase advertising" of alcoholic beverages. *Actmedia*, 830 F.2d at 967.[5] However, the Supreme Court has since made clear that the First Amendment does not allow the government to silence truthful speech simply for fear that adults who hear it would be too persuaded. Even in the context of commercial speech, "the fear that people would make bad decisions if given truthful information cannot justify content-based burdens on speech." *Sorrell*, 131 S. Ct. at 2670–71; *see also 44 Liquormart*, 517 U.S. at 503 (opinion of Stevens, J.) ("The First Amendment directs us to be especially skeptical of

---

[5] *Actmedia* does not appear to have definitively held that an additional goal of section 25503(h) is the suppression of point-of-purchase advertising. *See Actmedia*, 830 F.2d at 967 ("Moreover, *to the extent* that the California legislature has determined that point-of-purchase advertising is a direct cause of excessive alcohol consumption, limiting that advertising is obviously the most direct and perhaps the only effective approach available." (emphasis added)). Other courts that have examined section 25503 and similar tied-house statutes in detail have not found this goal to animate the laws. *See, e.g.*, *Nat'l Distrib. Co.*, 626 F.2d at 1009–10; *Cal. Beer Wholesalers Ass'n*, 5 Cal. 3d at 407.

regulations that seek to keep people in the dark for what the government perceives to be their own good.").

We conclude that *Actmedia* is no longer binding in light of the Supreme Court's opinion in *Sorrell*. Following *Sorrell*, section 25503(f)–(h) must survive heightened judicial scrutiny to stand.

## D. We Remand for the District Court to Apply Heightened Judicial Scrutiny.

While we conclude that *Actmedia* is clearly irreconcilable with *Sorrell*, we remand for the district court to apply heightened judicial scrutiny in the first instance. A remand is appropriate in this case for several reasons. First, RDN did not move for summary judgment in the district court and agreed at oral argument that a remand for the district court to develop the factual record and apply heightened judicial scrutiny would be appropriate. The State also expressed a desire to develop the factual record should we find that *Actmedia* is no longer controlling. Second, the record before us is thin, as this appeal is from a motion for summary judgment rather than, as in *Actmedia*, from judgment after a trial. Third, the State should not be faulted for resting on *Actmedia*, which has been the law since 1986, rather than investing more resources in rallying to section 25503(f)–(h)'s defense. Confronted with similar circumstances, the Supreme Court approved of the Second Circuit's decision to remand for the district court to apply the third and fourth *Central Hudson* factors in the first instance. *Fox*, 492 U.S. at 475–76. Similarly, we recently declined to fault a plaintiff for relying on an overruled decision that had "been the law of the circuit since 1985," and thus remanded "on an open record to allow [the plaintiff] an opportunity to make" the required showing.

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1092 (9th Cir. 2015). Here too we remand on an open record to give the State a chance to meet its burden and for the district court to apply heightened judicial scrutiny in the first instance.

On remand, there are several considerations that should be addressed in applying heightened judicial scrutiny. As an initial matter, we observe that the State's goal of suppressing a particular commercial structure, rather than a particular commercial message, remains valid. *See Granholm v. Heald*, 544 U.S. 460, 466 (2005) (maintaining a "three-tier distribution system" is a legitimate governmental interest); *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 715 (1984) (noting that "exercising control over . . . how to structure the liquor distribution system" is a legitimate exercise of a State's Twenty-first Amendment powers). The broad goal of "temperance" also remains "a valid and important interest of the State under the Twenty-first Amendment." *Costco Wholesale Corp. v. Maleng*, 522 F.3d 874, 902 (9th Cir. 2008). However, "state laws that violate other provisions of the Constitution [including the First Amendment] are not saved by the Twenty-first Amendment." *Granholm*, 544 U.S. at 486. Moreover, to the extent that the legislature intended to promote temperance by reducing the amount of point-of-purchase advertising, as *Actmedia* assumed, the court's skepticism regarding whether section 25503(f)–(h)'s burden on expression directly advances and is fit to achieve a permissible goal should be deepened. This is because a statute tailored to fit an impermissible goal of suppressing commercial speech for fear that it will persuade is less likely to be a close fit for another, permissible goal of the statute.

As noted, with respect to the third *Central Hudson* factor, the "Government carries the burden of showing that the challenged regulation advances the Government's interest in a direct and material way." *Coors Brewing Co.*, 514 U.S. at 487. "That burden is not satisfied by mere speculation or conjecture." *Id.* Rather, to survive scrutiny "a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id*. On remand, the district court should consider whether the State has shown that there is a real danger that paid advertising of alcoholic beverages would lead to vertical or horizontal integration under circumstances existing in the alcoholic beverage market today. While we "hesitate to disagree with the accumulated, common-sense judgments of [the] lawmakers" who enacted section 25503(f)–(h), *see Metromedia*, 453 U.S. at 509, we cannot say on the record before us that the State's Prohibition-era concern about advertising payments leading to vertical and horizontal integration, and thus leading to other social ills, remains an actual problem in need of solving. Additionally, the district court should consider whether the State's concern about paid advertising leading to horizontal and vertical integration is real in the circumstances of this case. Here, advertising payments to retailers are made by a third party, not directly by a manufacturer or wholesaler of alcoholic beverages. There may be additional reasons to doubt the State's concern about advertising payments actually leading to vertical or horizontal integration in these circumstances.

The district court must also consider whether the State has shown that section 25503(f)–(h) materially advances the State's goals of preventing vertical and horizontal integration and promoting temperance. We note that the increasing number of statutory exceptions to section 25503(f)–(h) call

into doubt whether the statute materially advances these aims. Cal. Bus. & Prof. Code §§ 25503.1–25503.57; *see Coors Brewing Co.*, 514 U.S. at 489 (finding "little chance" that a law "can directly and materially advance its aim, while other provisions of the same Act directly undermine and counteract its effects"). Additionally, the record before us does not demonstrate that a prohibition on paid point-of-sale advertising materially advances the goal of temperance.[6] Indeed, a study discussed in *Actmedia* suggests that the effect of paid advertising is only to persuade customers to purchase a particular brand, not to purchase and consume more alcohol. *See Actmedia*, 830 F.2d at 961–62.

With respect to the fourth *Central Hudson* factor, heightened judicial scrutiny demands a "fit between the legislature's ends and the means chosen to accomplish those ends." *Sorrell*, 131 S. Ct. at 2668. We cannot say on the record now before us that section 25503(f)–(h) is narrowly tailored to serve the State's interest in preventing advertising payments from undermining its triple-tiered distribution and licensing scheme. For example, the State's interest might be achieved by policing advertising agreements made between retailers, manufacturers, wholesalers, and intermediaries like RDN, rather than by banning paid advertisements of alcoholic beverages in retail stores. The State's additional goal of

---

[6] On this score, the State's expert states that "[i]t is almost impossible to pull a single regulation out of the system and determine exactly what it does and how it contributes to an overall goal such as temperance." Although we leave it for resolution on remand, we observe that this acknowledgment would suggest that the State will have a difficult time carrying its burden of showing that section 25503(f)–(h) directly and materially advances the State's asserted interests in preventing vertical and horizontal integration of the alcoholic beverage industry and promoting temperance. *See Edenfield v. Fane*, 507 U.S. 761, 767 (1993).

increasing temperance might be achieved by regulating the prices of alcoholic beverages, limiting when and where they are sold, or adopting educational programs, rather than by burdening commercial speech of particular content by particular speakers. On remand, the district court should consider whether the State has demonstrated the requisite fit between section 25503(f)–(h) and the State's goals.

While we decline to decide these issues on the thin record before us, the State must meet its burden on remand.

## III.

Twenty-nine years ago, in *Actmedia, Inc. v. Stroh*, 830 F.2d 957 (9th Cir. 1986), we held that California Business and Professions Code section 25503(h) was consistent with the First Amendment. Today we hold that *Actmedia* is no longer binding in light of *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011). As a content-based restriction on non-misleading commercial speech regarding a lawful good or service, section 25503(f)–(h) now must survive heightened judicial scrutiny. We remand on an open record for the district court to apply heightened judicial scrutiny in the first instance.

**REVERSED and REMANDED.**